argument next in appeal number two thousand nine one four one five Gillig vs Nike Mr. Silverman, good morning. Good morning. You may proceed. This is a matter that involves a number of very fundamental concepts in Arjar's prudence. First and foremost among these is the concept of jurisdiction and the meaning or implications which flow from a determination by a court that it does not have jurisdiction. We have a situation here where the district court had concluded it did not have jurisdiction by reason of lack of standing of the party known as TTG for abbreviation, a longer corporate name. So TTG, who was the plaintiff in the original case, was determined at a point in time, four and a half years after the original case was filed, not to have received an adequate or sufficient either assignment or right to pursue a cause of action predicated on an assignment. And in my opinion, there's some area of ambiguity there, but it's not germane to the issues before this body. The district court considered this issue as a matter of summary judgment following the line of cases starting with the McBee's case and felt that this was intertwined with the merits and therefore the merits of who had title to these trade secrets and therefore decided it, as I understand it, at your client's urging on the merits as a matter for summary judgment. Let me address that, Your Honor. What my client had urged in what the parties in their briefs referred to as TTG 1, the first of the two of these cases, is that the issue of standing be decided upon summary judgment standings, not that all elements or any other element necessary to prove appropriation of a trade secret be determined. What we agreed to, to be determined on summary judgment principles, in other words, to draw out to whatever factual predicate the court might have to weigh in order to make a determination on that issue of standing, was limited simply to that because there was no or would be no jurisdiction if the plaintiff had no standing to begin with. You're arguing, let me be sure I understand what you've just told us, which is that the request that the decision be made on summary judgment is procedurally no different than a 12B1 motion for purposes of determining the jurisdictional question of standing. Is that what you're now telling us? Yes, and particularly given that the lapse of such a period of time, it seemed more appropriate that whatever facts had been generated during that period of pendency be a part of the court's consideration. But does it really make a difference which it is? Suppose it is a dismissal on the merits, but that would be a determination that TTG did not have a claim. It wouldn't necessarily be a determination that Gillick didn't have a claim. In fact, it's a determination that you could view as a determination that Gillick retained the ownership. That's what the court seemed to be saying. That is how we construed it, and we certainly would not have brought the second action if we hadn't construed it that way. Now, when we got into the briefing after dismissal of the second case, then we frankly scrutinized with much more detail what the court had ruled at the end of the first case. What I'm saying is that even if the first one were viewed as a dismissal on the merits of a TTG claim, that's not res judicata as to a claim by Gillick. We agree with that, but we also feel strongly that the merits, in any event, were never reached in TTG1. And because the merits were never reached, then the issue of privity is academic. I have some other remarks. Well, I'd like you to address the statute of limitations issue because that's an alternative ground here, and I know that doesn't affect the inventorship claim, but it does potentially affect the trade secret claim. Well, I believe my adversary has raised res judicata as a defense to all of our claims. Yes, I understand that. But the statute of limitations issue is raised as a defense to the trade secret claim, right? Yes, to the trade secret. Yes, that's correct. So even if you win on res judicata, we've still got the statute of limitations issue. Yes, you do. And, indeed, doesn't the statute of limitations issue pretty well dispose of the trade secret argument so that the only thing left is inventorship? Do I misread that? That is absolutely correct, Your Honor. So let me address the statute of limitations issue then. Our position is that, well, there are two essential principles under Texas law. There's equitable tolling and there's legal tolling. Legal tolling is perhaps more easily defined. There is no legal tolling here, is there? There's no statute? No, it's not a statute. Texas law, as we read the case law, is applicable to statute of limitations as it would apply to the trade secret claims. But there is nothing that prohibited Mr. Gillick from joining the litigation, from seeking to join the litigation, or from TTG seeking to amend the complaint to add Mr. Gillick? Well, Your Honor, I'm glad you raised that question because that's exactly what Mr. Gillick did try to do at the conclusion of TTG 1. Before the conclusion, he moved. Well, maybe he waited a little too long, but there's nothing that would have prevented him had he started in a more timely fashion, shall we say. There's nothing that prevented him from starting a new suit? Well, if I could address the question in sequence, Your Honors. Mr. Gillick had received in excess of 80 percent of the stock of the company in what he believed was in consideration for the conveyance of his trade secrets to the corporate plaintiff in TTG 1. So the issue or the question that there might have been some inadequacy or some deficiency in this transfer never entered his mind until four-plus years after TTG 1 was filed. When it did arise as an issue, he promptly moved to be joined or to substitute in under Rule 17, which Nike opposed and the court ruled in Nike's favor that he could not join. Now, with that in hand, one, now turning to your question, Your Honor, in theory, Mr. Gillick could then have gone off and started a stand-alone piece of litigation. However, the determination on the issue of standing was still before the Fifth Circuit. So under Texas law and our knowledge, all applicable statute of limitations law, when the right of one party or a party turns upon the determination of a right or a non-right of another party, that is a permissible delay as long as the defendant is on notice in all respects of the nature of the claim. And that is really the essence of both the legal and equitable tolling principles that are involved as far as the statute of limitations is involved. There was no secret here. Nike was fully aware of the need. There was no surprise. There was nothing new, as a matter of fact, other than the inventorship claims, which arose in the case of seven of the eight patents after the date of filing. But don't these Texas equitable tolling cases go on the proposition that the second suit is not barred because it could not have been brought until the conclusion of the first suit? And you've just conceded here that Gillick could have brought a suit without waiting for the conclusion of the first suit. Perhaps I didn't say it well, Your Honor. I'm saying he could have brought it, but it would not have been appropriate. Possibly it would have been a Rule 11 violation because he would not have known whether or not he had a right to bring the second suit until the first matter was resolved. Yes, he physically could have filed it at a courthouse, but it would not have been an appropriate filing because he could not have been aware whether or not he had a right to file the second action until the resolution of the first action. You are into your rebuttal. Would you like to reserve your time? Yes, I'd like to reserve it. All right. Very good. Mr. Rank, good morning. Good morning. Good morning, Your Honors. I'd like to first address the issue of whether Mr. Gillick could have joined the case. In January of 2004, when the complaint was filed in this case, we immediately responded by saying we deny the allegation that Triple T Gulf has any ownership rights in these trade secrets. We propounded production requests asking for written assignment documents. I personally deposed Mr. Gillick twice and asked about the assignments, and I got conflicting testimony about I think there's a document, I don't know if there's a document. The case progressed all the way up to the Fifth Circuit and back, and on the eve of trial the second time, Judge McBride looked at me and asked whether we're still contesting standing, and I said yes, because we don't know who owns these rights. Judge McBride then turned to counsel and said is there a written assignment, and for the first time we learned there was a written assignment document. At that time we learned there were board resolution documents and special shareholder meeting documents that hadn't been produced, and when they were produced, the judge conducted a deposition of Triple T Gulf. In his courtroom, Mr. Gillick was the witness on his own behalf and on the company's behalf, and that's when the judge determined essentially he was at a loss to know who owned these rights, because in those resolutions there were all kinds of references to securing the rights from individuals such as Claire Laux and the Elizabeth Gillick J. Gillick Trust. At that time the judge gave the parties an opportunity to supplement the summary judgment record, and he listened to the submission or looked at the submission that Triple T propounded and said I'm still at a loss, and if you look at appendix pages 409 to 415, he uses those very words as to who has ownership interest in these rights, and as a result he wouldn't conclude that Mr. Gillick was the true party in interest under Rule 17. So there's been no determination that Mr. Gillick is in fact to this day the true owner of the trade secrets. What about the ownership of the patent rights? Yes, the patent rights. Ownership and inventorship. Inventorship, yeah. The inventorship counts of the complaint here are brought by Gillick, right? That's a little bit unclear. Well, I don't think it's unclear. I think it's what the counts state, that it's a claim by Gillick for correction of inventorship. To the extent that that is the case, if you look at paragraph 55 of the complaint, the January 2004 complaint, Triple T Golf said, essentially Nike began allegedly using these so-called trade secrets in the patenting process as early as 2001. At the end of discovery in 2005, Triple T sought leave to add inventorship counts and said they arise out of the same transaction or occurrence. So this goes to the issue of same claim, whether the claims could have been brought. Yeah, but I don't think you're answering my question. What is your position as to whether Gillick put aside race judicata, put aside statute of limitations, let's suppose that those issues are out of the case. What is your position as to who has the inventorship claim? The inventorship claim is essentially barred under race judicata principles. I don't think you can divorce them. I understand. Forget about that. Put that to one side. Suppose we rule against you on both race judicata and statute of limitations, just hypothetically, okay? Who owns the inventorship claim? Mr. Gillick arguably owned the inventorship claim, but it's barred by race judicata. I don't think you can divorce them with all due respect, Your Honor, and here's why. Well, we can ask hypothetical questions, you know. We do that all the time. I understand. I understand, and I'm trying to answer the question. But if I may go back to the time when the Fifth Circuit remanded the case after being misled about who, when these patent applications came to the fore, the Fifth Circuit in 2007 said, gee, I think patents are relevant. I think they're relevant to this case. Go back and add them. At which time, Triple T Golf didn't seek leave to add any of the patents, and all of the eight patents that were at issue or that are at issue in the second lawsuit had issued at that point in time. But if the claim was Gillick's claim and not Triple T's claim, then why would it have been added? Gillick wasn't a party to that loss. But, again, that's why, with all due respect, I think you have to look at the privity issue in the context of race judicata. Mr. Gillick was the only employee of Triple T Golf. He owned 80% of the company. He was the only witness who testified on behalf of the company. He went to every settlement conference. Extensively, he hired counsel. He is the individual who controlled the case, and under race judicata privity rules, he was in privity with the company and could have raised those claims, just as he could have been named himself as a party plaintiff. He's in privity with respect to the inventorship claim, which he owns? I'm having trouble understanding that. Well, I think, again, if you look back at the race judicata doctrine in the Fifth Circuit, you look at the privity in the context of the parties. Were they identical or were they in privity? Then you look at the transactional test, and all of the claims arose out of the 2000 meeting between Mr. Stites and Mr. Gillick. So if you go back to the transactional test, all these claims had to have been raised. Just as Mr. Gillick could have been named as a party, he was, in essence, in privity with the company, and these issues could have been raised. At the time, Triple T Golf raised the issue of inventorship in 2005 and tried to add patents. There was no argument that it didn't own the rights. Do you agree that under our decisions in Mediatek and University of Pittsburgh, that if the dismissal here was for lack of standing, that there is no race judicata bar? There's a race judicata bar here because the court exercised jurisdiction under a very specific body of Fifth Circuit law. You're not answering my question. If we follow Mediatek and University of Pittsburgh, which both seem to be directly in point, and we consider the dismissal to have been for lack of standing, you lose, right? If the dismissal was for lack of standing on the race judicata issue, yes. But, again, I believe that Mediatek was distinguishable. Because? Because it was Ninth Circuit law that was applied. There's no indication that the Ninth Circuit follows the same tests that the Fifth Circuit does insofar as converting the jurisdictional question to a full trial or full adjudication on the merits. And that's what we have here. If you read Mediatek, it was a clear-standing issue. If you read this case, at the appellant's behest, the district court converted the jurisdictional question to a full decision on the merits. It wasn't summary judgment on jurisdictional issues. If they would have adduced summary judgment evidence of two of the three elements of the tracing… But I don't understand how it can be a bar, even if it were a merits decision, because it would only be a merits decision that TTG didn't own the trademark. No. Actually, it's a merits-based decision, with all due respect, Your Honor, on two of the three elements of a trade secret's cause of action under Texas law. Under Texas law, Guy v. Carpenter, which is cited in our brief, you have to show ownership of a trade secret and a confidential relationship, and then use or misappropriation of the trade secret. But even under your view, if it were a merits decision, it was just a merits decision on the ownership issue, right? No. It was a merits-based decision on two of the three essential elements of the cause of action, because what the district court did is… Which cause of action? The inventorship cause of action or the trade secret cause of action? Yes, Your Honor, the trade secret's cause of action. And as a result, then the court looked at… Well, I don't understand your theory. I mean, I at least understand what you're saying when you say, well, if it was a merits decision, it was a merits decision that determined that TTG didn't have ownership. But how could it be anything beyond that? Well, if you look at the district court's decision, he struggled with two elements of the cause of action when he converted the jurisdictional question to a full decision on the merits, to a ruling on the merits. And he said there are two elements that you have to prove, and I need to know whether Triple T Gulf has both of them. I need to know, A, whether they own the trade secrets, in other words, whether they were assigned, and I need to know, B, whether the confidential relationship, the alleged confidential relationship between Mr. Gilly… Where did the district court rule on the confidential relationship issue? When the district court dismissed the case initially that went up on appeal and was affirmed in his decision at pages… This is the summary judgment motion? This is the summary judgment motion, yes. So you're saying the summary judgment motion was not limited to the question of who owned the trade secret but went beyond that? Correct, also who owned the confidential relationship. If you look at A378… Who owned the confidential relationship? Right. A378? A378 and A415, I believe. But even if that's true, the puzzle is how did the district court reach those merits issues if one of the issues was who owned the trade secret? And the district court concludes TTG did not own it.  The district court reached the decision on the merits after agreeing with TTTG that when the jurisdictional issue is intertwined on the facts with the merits, you accept jurisdiction, you exercise jurisdiction, and you determine the underlying merits-based issues. And McBeath case, the Sierra Club case, the Continental Can case, the whole litany of cases that the district court cited to in support of this proposition is what it relied on to decide the issue on the merits. And what it essentially decided is TTTG didn't deduce summary judgment evidence on two issues, ownership of the trade secret and ownership of the confidential relationship. Now, I don't understand that second thing. I mean, the page that you pointed us to, it concludes they lack standing and that the ownership claims element of plaintiff's alleged cause of action cannot be proved by plaintiff. That is only addressing the ownership issue. 378. You mentioned another page as well. 415, I believe. Again, referring to ownership interest. It doesn't say anything about the lack of a confidential relationship. I don't know what you're talking about. With all due respect, Your Honor, if you read the last sentence, it says, well, I can read the entire sentence so it's in context. The dismissal is appropriate by reason of plaintiff's failure to establish standing as well as because of the failure of the summary judgment record to raise a genuine issue of fact as to an essential element of plaintiff's claim that Gillig assigned plaintiff whatever rights Gillig acquired from his dealings with Stites in September. As he refers to that up above, that's a determination that TTG lacked the ownership interest. He said whatever rights Gillig acquired from Stites. That means an agreement. We're interpreting that to mean an agreement to keep in confidence the information that was exchanged. I don't see how you can interpret that. Well, that's the only possible element of the cause of action that Mr. Gillig could have acquired from Mr. Stites during that meeting because the other issue is the transfer of the so-called trade secrets, which he would not have acquired from Mr. Stites. Those are rights that he already possessed. Is there any reference in this thing to confidential relationship? Those are the two references that I'm aware of. I can provide a separate presentation. So he doesn't use the words confidential relationship? I don't believe that he did, and I can provide citations to the two issues when he converted this standing issue to a decision on the merits. I can provide citations to the two elements being of concern to him. Again, one being the assignment of the rights and the second being the assignment of what he acquired from Mr. Stites, which is the agreement to allegedly keep in confidence the information. In order to get where you want us to go, we have to buy this intertwining concept, don't we? I think you have to follow Fifth Circuit law, which is what the district court did and which is what the Fifth Circuit affirmed on. If you look at A378, and this was a final judgment of the Fifth Circuit that the district court cited in his decision dismissing this case, he said it's clear to him that the district court also dismissed on the merits because in addition to talking about the summary judgment issues, it talked about the other summary judgment issue, which was whether Triple T Golf was a consumer under the Deceptive Trade Practices Act, and that's a substantive issue. So the Fifth Circuit, by the letter of his decision, seemingly issued a final judgment on the merits of this case. I see I have two minutes left. I'd like to address the statute of limitations issues. First, with respect to statute of limitations, there's no dispute that the statute of limitations is told. This lawsuit was filed five years and eight months after Mr. Gildick knew or should have known of the alleged misappropriation of the trade secrets. It's two years and eight months late. The two doctrines that are ---- Did you say no dispute it was told? I'm sorry, no dispute that it ran. I apologize. Thank you for correcting me. I was going to say that's for the record. Do you mean that? Thank you. Thank you. I appreciate that. There's no dispute that it ran. The action was filed two years and eight months late. In the context of legal tolling under Texas law, a second action in order for it to apply, the second action has to be based upon some determination in the first case. So the viability of the second case has to be contingent upon the first case. Here, the first case wasn't about who owned the trade secrets, as between Mr. Gildick and Triple T Gulf. So legal tolling doesn't apply. Mr. Gildick could clearly have filed this lawsuit on his own. He could have joined in the lawsuit when it was filed at the outset. How about equitable tolling? Under equitable tolling, under U.S. v. Petty, there has to be – first of all, it's a rare and exceptional circumstance when equitable tolling is applied. And the circumstance has to be external to the party. Here, the whole issue of who was joined and when they were joined were decisions made clearly by Mr. Gildick and counsel, nothing external. Again, back in 2004 when we contested the issue of who owned the so-called trade secrets, we said, you know, be put to your proofs. They could have corrected the issue. There was nothing external here at all. So I see I'm about out of time. For all the reasons that we set forth in our brief, we respectfully request that the district court be affirmed in all respects. Okay, Mr. Rank, thank you very much. Mr. Silverman? We have a little over four minutes in rebuttal. Thank you, Your Honors. I'll try to be brief here. I would like to emphasize the impracticality, if not the ethical – Mr. Silverman, speak up, please, or you're mumbling. I'm sorry, Your Honor. Yes. I'd like to address the statute of limitations issue and just to amplify upon some of my earlier remarks. In our view, Mr. Gildick could not have appropriately filed a parallel claim to have alleged standing in one case while a company in which he was an 80% stockholder was suing for exactly the same thing in another, possibly even the same federal district court. I think it is fantasy to suggest that that could have in any way been proper. Mr. Gildick was the vice president. He had responsibility for managing the litigation. He was a principal actor in the alleged appropriation of trade secrets. For him to have gone out on his own in a separate direction in some other district court, had it not been unethical, it almost would certainly have been dismissed rather promptly. We don't think that is a sensible – Well, it wouldn't have been dismissed. He could have brought a contingent claim saying, you know, there's a litigation going on as to the ownership of this property. We think that TTG owns the trade secrets, but if there's a determination that they don't, and I'm the owner, here's my claim. Certainly he could have filed a protective lawsuit and then presumably the lawsuit would be stayed rather than dismissed. I don't understand why it has to be dismissed just because it's contingent. Your Honor, had Mr. Gildick had any inkling that his – I should say the validity of his assignment of his trade secret claims to his corporation were questionable or dubious or vulnerable to attack, he would have taken or considered action along those lines. You have to consider his position. But the ownership issue was being challenged before the statute of limitations ran, wasn't it? It was referenced as an affirmative defense, and as Mr. Rank pointed out, in discovery approximately two years after the case was filed, a request was made of whether or not the assignment had occurred in writing or otherwise. Mr. Gildick in his testimony, I think on various occasions, indicated that it was an oral assignment. As a matter of fact, this corporate document, which Mr. Rank prefers, itself was never an assignment per se. It was simply a confirmation that he had made an oral assignment, that that was the reason that he had received his stock. So there was no written assignment. There was a written resolution that confirmed that he had made an oral assignment approximately three weeks after his meeting with this predecessor entity to Nike Golf. So that is the reason. Had the man had a crystal ball, I guess, yes, he could have filed such a contingent action. He's not an attorney. He's a technical person. And none of the lawyers had any reason to doubt, as we try to amplify in our reply brief, none of the lawyers had any reason to doubt the validity of the oral assignment under Florida law. Any final point? Yes. That the inventorship claims, in any event, are not subject to any statute of limitations argument, and certainly race judicata, even if it is somehow found to have survived University of Pittsburgh and Media Tech, would have no bearing on Gillig's rights to proceed on his inventorship claims. All right. Thank you, sir. Thank you very much. Thank both counsel. The case is submitted.